**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**November 16, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP817**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2021ME480**

**IN COURT OF APPEALS**
**DISTRICT II**

IN THE MATTER OF THE CONDITION OF A.P.D.:

WINNEBAGO COUNTY,

    PETITIONER-RESPONDENT,

  V.

A.P.D.,

    RESPONDENT-APPELLANT.

        APPEAL from orders of the circuit court for Winnebago County: JOHN A. JORGENSEN, Judge. *Affirmed*.

¶1     GROGAN, J.[1]  A.P.D. appeals from two WIS. STAT. ch. 51 orders extending his commitment entered after a bench trial in January 2022.  The circuit court ordered him recommitted[2] for twelve months and ordered involuntary medication and treatment during that time.  A.P.D. contends the circuit court erred in concluding Winnebago County proved by clear and convincing evidence that he had a mental illness or that he was dangerous under the fifth dangerousness standard in WIS. STAT. § 51.20(1)(a)2.e.  As a part of the latter argument, A.P.D. claims the circuit court failed to make the requisite findings set forth in *Langlade County v. D.J.W.*, 2020 WI 41, ¶59, 391 Wis. 2d 231, 942 N.W.2d 277.  This court affirms.

## I. BACKGROUND

¶2     In November 2021, A.P.D.'s treating psychiatrist, Dr. George Monese, wrote a letter to the circuit court recommending an extension of A.P.D.'s initial commitment.[3]  Dr. Monese recommended the extension because A.P.D. told the doctor that he was only taking the medication "because he is under court order[,]" A.P.D. does not believe he has a mental illness, and that A.P.D. "will take the first opportunity to get off the medications."  Based on that lack of insight, Dr. Monese advised that A.P.D. "is likely to become the subject for

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] "Recommitment" is synonymous with "extension of a commitment," and the terms will therefore be used interchangeably.  *See Sheboygan County v. M.W.*, 2022 WI 40, ¶6 n.3, 402 Wis. 2d 1, 974 N.W.2d 733.

[3] In a letter dated November 12, 2021, Dr. Monese recommended extending A.P.D.'s ch. 51 commitment.  In a follow-up correspondence, Dr. Monese provided further information in support of his request.

Chapter 51 commitment if it was withdrawn at this time." The letter also told the court that despite Dr. Monese's "lengthy explanation to [A.P.D.] of the risks and the benefits of treatment, [A.P.D.] was unable to use this information to his best interest." Dr. Monese also submitted a form requesting the extension of A.P.D.'s commitment and involuntary medication orders to the County, asserting that A.P.D.:

- "[I]s mentally ill and his diagnosis is Bipolar disorder, Manic[,]" and A.P.D. "continues to have a substantial disorder of" "thought" and "mood" "which grossly impairs" A.P.D.'s "judgment" and "capacity to recognize reality[.]"

- "[I]s a proper subject for treatment."

- "[I]s dangerous because there is a substantial likelihood, based on his treatment record, that he would become a proper subject for commitment if treatment were withdrawn" because he "evidences" "dangerousness" under the fifth statutory standard.

- Is "not competent to refuse medication or treatment" and that when Dr. Monese "recently tried to explain" "the advantages, disadvantages, and alternatives to accepting a particular medication or treatment[,]" A.P.D., "because of his mental illness," is not capable of understanding or applying them and is unable "to make an informed choice as to whether to accept or refuse medication or treatment."

¶3      The County then filed a formal Petition for Recommitment and for Involuntary Medication or Treatment with the circuit court. The matter was originally scheduled for a bench trial on January 6, 2022, in front of a different circuit court than the one that ultimately presided over A.P.D.'s trial and entered the orders at issue on appeal. However, when the parties arrived for the trial, they informed the judge of a potential conflict of interest due to the fact that A.P.D. "might have made some threats" to that judge. As a result, this case was reset for

a bench trial on January 19, 2022, before the circuit court judge noted in this opinion.

¶4    Dr. Monese was the only witness to testify at the trial. Much of his testimony will be provided below. After his testimony, the parties made their final arguments. The County argued it proved each element for the recommitment by clear and convincing evidence. A.P.D. argued only that the County failed to prove that he was dangerous. The circuit court determined that the County met its burden of proof, ordered A.P.D. recommitted for twelve months, and entered a concomitant order for the administration of involuntary medication. A.P.D. now appeals.

## II. DISCUSSION

¶5    This case involves a WIS. STAT. ch. 51 recommitment, which is governed by WIS. STAT. § 51.20. To involuntarily commit an individual, a county must establish by clear and convincing evidence that the person is mentally ill, a proper subject for treatment, and dangerous. Sec. 51.20(1)(a)1-2, (13)(e), (13)(g)3; *Waukesha County v. J.W.J.*, 2017 WI 57, ¶18, 375 Wis. 2d 542, 895 N.W.2d 783.

¶6    "To prevail in a recommitment proceeding, the petitioner must demonstrate the same three elements necessary for the initial commitment[,]" but "'WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of [commitment] immediately prior to'" the recommitment petition. *Sheboygan County v. M.W.*, 2022 WI 40, ¶¶18-19, 402 Wis. 2d 1, 974 N.W.2d 733 (quoting *Portage County v. J.W.K*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509). Dangerousness "'may be satisfied by a showing that there is a substantial likelihood, based on the subject

4

individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting § 51.20(1)(am)). This method of proving dangerousness is necessary because "'an individual receiving treatment may not have exhibited any recent overt acts or omissions demonstrating dangerousness because the treatment ameliorated such behavior, but if treatment were withdrawn, there may be a substantial likelihood such behavior would recur.'" *M.W.*, 402 Wis. 2d 1, ¶20 (quoting *J.W.K.*, 386 Wis. 2d 672, ¶19). If the County relies on § 51.20(1)(am) to prove dangerousness, a link to one of the five dangerousness standards enumerated in § 51.20(1)(a)2 is required. *See D.J.W.*, 391 Wis. 2d 231, ¶59. And, the circuit court must "make specific factual findings with reference to the subdivision paragraph of WIS. STAT. § 51.20(1)(a)2. on which the recommitment is based" so that: (1) an individual will know which dangerousness standard forms the basis of the recommitment; and (2) appellate courts receive a better record to review. *D.J.W.*, 391 Wis. 2d 231, ¶¶3, 42-44.

¶7      Our supreme court imposed this directive because, in *D.J.W.*, the circuit court's failure to identify the specific dangerousness standard created confusion on appeal. *Id.*, ¶¶38-40. Specifically, before the court of appeals, the county did not identify a specific dangerousness standard, which resulted in the court of appeals selecting WIS. STAT. § 51.20(1)(a)2.d during the course of its analysis. At oral argument before the supreme court, however, the county argued that the recommitment was based on the third standard, § 51.20(1)(a)2.c. *D.J.W.*, 391 Wis. 2d 231, ¶¶38-40.

¶8      The significance of the directive set forth in *D.J.W.*, as our supreme court acknowledged in *Sauk County v. S.A.M.*, is to ensure that all parties and the reviewing courts know which statutory dangerousness standard the recommitment

is based upon. *See Sauk County v. S.A.M.*, 2022 WI 46, ¶36, 402 Wis. 2d 379, 975 N.W.2d 162. Failure to identify the particular dangerousness standard deprives the commitment subject of due process and interferes with an appellate court's ability to review a challenge to the sufficiency of the evidence.

¶9     Here, A.P.D. makes two arguments. First, he contends the evidence is insufficient to prove he suffers from a mental illness. Second, he contends the evidence is insufficient to prove he is dangerous. These issues present "a mixed question of law and fact"; this court "uphold[s] a circuit court's findings of fact unless they are clearly erroneous[,]" but whether the facts satisfy the statutory standard of dangerousness is a question of law this court reviews de novo. *See D.J.W.*, 391 Wis. 2d 231, ¶¶24-25. "'When the trial court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and of the weight to be given to each witness's testimony.'" *S.A.M.*, 402 Wis. 2d 379, ¶33 (citation omitted).

*A. Mental illness*

¶10    A.P.D. argues there is insufficient evidence to support the circuit court's determination that he suffers from a mental illness because the only evidence in support of the diagnosis is "conclusory" testimony his treating psychiatrist, Dr. Monese, provided. A.P.D. contends Dr. Monese needed to give more details about his mental illness and diagnosis before the circuit court could find he had a mental illness. This court rejects A.P.D.'s argument.

¶11    First, A.P.D. did not challenge whether he had a mental illness at his trial. Rather, he focused only on whether he was dangerous. Thus, he cannot raise issues on appeal that he did not raise in the circuit court. *See State v. Mercado*, 2021 WI 2, ¶35, 395 Wis. 2d 296, 953 N.W.2d 337 (recognizing that courts

generally do not allow attorneys to "sandbag" the other side by not raising an issue below and then "alleg[e] reversible error upon [appellate] review"). The transcript, in fact, reflects that A.P.D.'s counsel suggested that A.P.D. is not dangerous *because he recognizes that he has a mental illness* that requires him to take medication. Referring to notes in A.P.D.'s medical chart, A.P.D.'s counsel pointed out that A.P.D. told staff that "he needed help with his mental health because he was hearing too many voices" and "was requesting Thorazine."[4]

¶12 Second, the circuit court accepted Dr. Monese's testimony as sufficient proof that A.P.D. suffered from a mental illness. It did so based on Dr. Monese's expertise and experience and because the doctor had been treating A.P.D. for his mental illness for some time. It is necessary for circuit courts to rely on the testimony of doctors because "[w]hether a person is mentally ill is a *medical* judgment, made by applying the definition of mental illness in WIS. STAT. § 51.01(13)(b)[.]" *State v. Dennis H.*, 2002 WI 104, ¶19, 255 Wis. 2d 359, 647 N.W.2d 851 (emphasis added; citation omitted). The circuit court found Dr. Monese credible, and this court sees no reason to overturn that determination. *See State v. Thiel*, 2003 WI 111, ¶23, 264 Wis. 2d 571, 665 N.W.2d 305 (we will not overturn a circuit court's credibility finding unless it is clearly erroneous). Based on Dr. Monese's credible testimony, the circuit court did not err in finding A.P.D. was mentally ill.

---

[4] The circuit court noted in its decision that A.P.D.'s mental illness of bipolar disorder "is not contested[.]"

### B. Sufficiency of evidence on dangerousness

¶13    A.P.D. contends the evidence was insufficient to establish by clear and convincing evidence that he was dangerous. As noted, the circuit court based the dangerousness finding on WIS. STAT. § 51.20(1)(am), linking it to the fifth dangerousness factor, § 51.20(1)(a)2.e. Thus, we review the Record to see whether it supports the circuit court's decision on dangerousness. As this is a recommitment, the County relied on subsection (1)(am), which requires a showing "that there is a substantial likelihood, based on [A.P.D.'s] treatment record, that [he] would be a proper subject for commitment if treatment were withdrawn." *See* § 51.20(1)(am); *see also* **M.W.**, 402 Wis. 2d 1, ¶20. The County argued that in relying on subsection (am), the statutory dangerousness link was to the fifth factor, § 51.20(1)(a)2.e, which as material to A.P.D., requires that:

> after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him … and because of mental illness, [he] evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his … mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his … recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he … will, if left untreated, lack services necessary for his … health or safety and suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his … thoughts or actions. The probability of suffering severe mental, emotional, or physical harm is not substantial under this subd. 2.e. if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable

probability that the individual will avail himself … of these services[.]

¶14   Although the Record in this case is somewhat sparse, having reviewed the circuit court's decision and the Record, this court concludes there was sufficient evidence from which the circuit court could determine that the County satisfied its burden of proving that A.P.D. was dangerous by clear and convincing evidence.

¶15   The circuit court heard the sworn testimony of A.P.D.'s treating psychiatrist, Dr. Monese. Dr. Monese testified that he had been treating A.P.D. for a while, and explained that he supervises the resident doctors at the Wisconsin Resource Center and reviews the residents' treatment notes and A.P.D.'s medical records. Dr. Monese also testified that he met with A.P.D. regularly, including on the morning of the trial and two weeks earlier. When asked if A.P.D. would "become a proper subject for commitment" if his treatment were withdrawn, Dr. Monese answered in the affirmative. The doctor agreed that A.P.D. is not competent to make his own medication or treatment decisions "because of his intrinsic mental health disorder[,]" and when asked if A.P.D. needs treatment "to prevent further disability or deterioration[,]" he confirmed this to be true. Dr. Monese explained that A.P.D. "has done very well in psychiatry treatment," particularly "given the kind of condition he was of dangerousness before[—]prior to starting commitment." The doctor acknowledged that A.P.D. is "doing much better" and "hasn't had any violent episodes" but that he does not have "insight[,]" which results in him denying to Dr. Monese that he has a mental illness and telling the doctor "that he wants all medications discontinued immediately." The doctor also testified to being concerned about A.P.D.'s "level of aggression" and referred to "the threats that he made to the judge before as well

as other individuals at the institution[.]" The threats were described as "severe and could not be ignored[,]" but Dr. Monese testified that treatment was helping A.P.D. In addition, A.P.D. stopped partaking in his "psychosocial intervention" therapy, which could benefit him, and without it, stopping the medications "may present problems in the future[.]"

¶16 Dr. Monese then clarified that A.P.D. made the threats and "carried them out" when he "was receiving only psychosocial intervention," noting the psychotherapy alone was insufficient to "contain his mental health disorder" and prevent dangerousness. The doctor said the threat to the judge was in April 2021, and the spitting at an individual therapist was "within the last six months in 2021."

¶17 When the County's attorney asked whether there is a "substantial probability" that A.P.D. "would suffer severe mental, emotional, or physical harm" if "left untreated" and would lose his "ability to function independently within the community[,]" Dr. Monese answered affirmatively. Without treatment for his mental illness, Dr. Monese opined that A.P.D.'s lack of insight would prevent him from functioning independently because he cannot interact normally with others in certain situations due to his "lack of volitional [control]." The doctor explained that because A.P.D. does not want treatment and just wants to be "left alone[,]" A.P.D. would not take part in any community services that may be available to him.

¶18 When asked about A.P.D.'s competency to refuse medications, Dr. Monese testified that A.P.D. is "unable to give informed consent to receive medication" and is "incompetent" and that, although he tried to explain the advantages, disadvantages, and alternatives to medication to A.P.D., he was unable to do so because A.P.D. got upset and walked away. Dr. Monese testified

that until A.P.D. agrees to take medication and work with his psychiatrist, he will need to be committed because, without the medication, he will have problems, be dangerous, will affect others, and "could die" without treatment. The doctor testified: "If you don't treat [A.P.D.'s mental illness], [A.P.D.] may die from it or kill other people[.]" When asked if A.P.D. showed "any willingness to voluntarily take medication or follow treatments as recommended[,]" Dr. Monese responded:

> Absolutely not. He told me that he doesn't want to take treatment today. He told me in no uncertain terms he does not want treatment, he does not want to take medications. In fact, the more I talked about it, he got upset and walked away as I was trying to explain.

¶19 Dr. Monese also testified about the advantages of A.P.D.'s medication: "Less tendency to become violent, more stable mood. Those are the most important ones. Stable mood and decrease of violent tendencies." He also testified that the disadvantages are "[s]ide effects including muscle stiffness, tiredness." With respect to alternatives, Dr. Monese explained there really "are no alternatives to the medications." He explained the medications can be supplemented with "psychotherapy" that is available to A.P.D., "but he has been refusing those of late, within the last one month to six weeks."

¶20 On cross-examination, A.P.D. pointed out the notes by staff (who Dr. Monese supervised) in the chart from Wisconsin Resource Center indicating that A.P.D. may not be dangerous to himself or others, that he is taking his medications, and his "insight and judgment are reasonable[.]" Dr. Monese admitted that these notes contained that information but said those notes were written by medical "residents who are training" and who forget both that A.P.D. is being forced to take the medications and that when he is on his medication, he appears reasonable.

11

¶21    Dr. Monese explained that he is "a specialist in this area who has been doing [this work] for so many years," and based on his evaluation of A.P.D., after going "through the details," A.P.D. does not have "reasonable insight." The doctor compared A.P.D.'s mental illness to hypertension: "If you don't treat it, you are going to have problems. Same thing here. If you don't treat it, he's going to have some problems."

¶22    The circuit court concluded, based on Dr. Monese's testimony, that the County proved by clear and convincing evidence that A.P.D. was dangerous under WIS. STAT. § 51.20(1)(am) and specifically connected that finding to § 51.20(1)(a)2.e, the fifth dangerousness standard. The circuit court specifically found:

- Dr. Monese to be "an expert in this area" who "has the knowledge of [A.P.D.]" as he has been treating him "for an extended period of time[.]"

- Dr. Monese reviewed A.P.D.'s records and "understand[s] his diagnosis."

- Based on Dr. Monese's evaluation, A.P.D. "will decompress if he doesn't take these medications if he isn't under this commitment order."

- Acts by A.P.D. are problematic. A.P.D. said "he's going to get off of the medications as soon as he can," and A.P.D. is not "participat[ing] in the other psychotherapy that will help him stay -- get healthy and stay healthy."

- A.P.D. "has a mental illness" that will "not just go away[.]"

- A.P.D.'s mental illness must "be treated and maintained, otherwise it guarantees decompression."

- A.P.D.'s history shows that without the treatment, he is dangerous to himself or others as evidenced by the past threats and A.P.D.'s indication that he will stop taking his medication.

- The County "met its burden" of establishing "there are grounds for the extension of the commitment" because A.P.D. "is mentally ill and he is dangerous pursuant to the standards under Chapter 51, specifically standard 'e' which is that he is going to decompress if he does not continue taking his medication and taking treatment."

- Medication controls A.P.D.'s dangerousness and "[t]he advantages and disadvantages to these medications or treatments have been explained to him or attempted to be explained to him."

- A patient cannot refuse to participate in a conversation about the advantages and disadvantages and then later claim these things were not explained to him because it "would be a ridiculous outcome where the patient would just hold his hands over his ears and then under that theory, they could never be committed or ordered to take these medications."

- Dr. Monese attempted to have the conversation about medication with A.P.D., but A.P.D. "walked away during that time period so they had been explained to him."

- Due to A.P.D.'s "mental illness, he's not competent to refuse the psychotropic medication or treatment because he's incapable of expressing an understanding of the advantages and disadvantages, substantially incapable of applying an understanding of the advantages and disadvantages to his condition to make an informed choice."

- "[T]he medication and treatment is necessary to prevent serious physical harm to himself or to others."

¶23    A.P.D. says Dr. Monese's testimony was not enough, and he argues that the doctor's testimony primarily just parroted the language of the statute. He also says the circuit court failed to make specific findings as directed by *D.J.W.*, and therefore this Record is insufficient to find A.P.D. dangerous. This court rejects A.P.D.'s arguments.

¶24    As explained, in a recommitment, to prove by clear and convincing evidence that a subject is dangerous, the County must establish that there is a

13

substantial likelihood that if treatment is withdrawn, A.P.D. would become a proper subject for treatment. The Record shows this to be the case. Dr. Monese explained that A.P.D.'s mental illness is not going to go away, and the only way A.P.D. will not be dangerous to himself or others is if he agrees to take his medication and continue treatment. A.P.D. indicated he will not take his medication or continue treatment if he is not subject to a commitment order.

¶25 The Record links A.P.D.'s dangerousness to WIS. STAT. § 51.20(1)(a)2.e, and the Record supports that link. The Record reflects that A.P.D. does not even want to talk about the advantages and disadvantages of treatment because he does not believe he has a mental illness. Dr. Monese testified to this and explained that A.P.D.'s lack of insight and volitional control makes him incompetent to make an informed choice. Dr. Monese, an expert in this area, explained that without treatment, A.P.D. will regress to his pretreatment condition, which will make him dangerous to himself and others and will cause him to be incapable of functioning safely in the community.

¶26 This court is also not convinced that Dr. Monese's use of statutory language in his testimony somehow renders his opinions or his testimony insufficient. The Record reflects that many of the questions the County asked "parroted" the statutory language, but this is the nature of these types of cases. Reference to the statutory language ensures that a subject is not committed unlawfully, and our supreme court has reversed a commitment when an expert failed to use the statutory terminology. *See Outagamie County v. Melanie L.*, 2013 WI 67, ¶91, 349 Wis. 2d 148, 833 N.W.2d 607. This court is convinced from Dr. Monese's testimony that his opinion was not just a parroting of the statute but rather that his opinion that A.P.D. met the recommitment statute's dangerousness requirement was based on his personal interactions with A.P.D.,

A.P.D.'s type of mental illness, A.P.D.'s treatment records together with Dr. Monese being A.P.D.'s treating psychiatrist, and A.P.D.'s insistence that he would discontinue his medication if he was released from the commitment. This is evident from the examples Dr. Monese provided and his explanation that A.P.D. has a mental illness that will not go away and that without the proper medication and treatment, A.P.D. will be a danger to himself and to others. The circuit court did not err in concluding from Dr. Monese's testimony—and all reasonable inferences derived therefrom—that the County proved by clear and convincing evidence that A.P.D. was dangerous under WIS. STAT. § 51.20(1)(am) with a link to § 51.20(1)(a)2.e, the fifth dangerousness standard.[5]

¶27 Here, we have an individual who has been committed after threatening a judge and making serious threats attributable to his mental illness. The administration of involuntary medication has controlled the danger. But A.P.D. says, "in no uncertain terms," that he will stop taking the medication as soon as he can. An expert (also A.P.D.'s treating psychiatrist) opined that the type of mental illness involved here requires medication and that without medication, A.P.D. will become dangerous again. There is no doubt these are challenging cases. This court certainly does not want to unnecessarily restrain A.P.D.'s liberty

---

[5] This court notes that the circuit court used the terms "decompress" and "decompression" instead of the statutory terms of "disability or deterioration," but that does not require this court to reverse. It is reasonable to infer from the circuit court's decision that it used "decompress" as an expression of A.P.D. returning to his pre-commitment dangerous condition if treatment stopped. "'[W]e accept reasonable inferences from the facts[.]'" *Winnebago County v. Christopher S.*, 2016 WI 1, ¶50, 366 Wis. 2d 1, 878 N.W.2d 109 (citation omitted). As we have often said, appellate courts do not insist that the circuit court use "magic words." *See State v. Brown*, 2020 WI 63, ¶27, 392 Wis. 2d 454, 945 N.W.2d 584 ("The law generally rejects imposing 'magic words' requirements."). It is clear from the circuit court's decision as a whole that it made the requisite findings.

and freedom. But, this court, based on this Record, is required to affirm. As our then-Chief Justice of the Wisconsin Supreme Court cautioned:

> [I]t is important for … all Wisconsin courts who adjudicate civil commitments and recommitments under WIS. STAT. ch. 51, to recognize that there is a category of seriously mentally ill individuals whose symptoms are described in WIS. STAT. § 51.20(1)(a)2.e. They are dangerous to themselves because their illness prevents them from understanding the advantages and disadvantages of treatment and, as demonstrated by their treatment history, they need care or treatment to prevent further disability or deterioration and they have a substantial probability, if left untreated, of losing the ability to function independently in the community or of losing cognitive or volitional control over their thoughts or actions.

*D.J.W.*, 391 Wis. 2d 231, ¶62 (Roggensack, C.J., dissenting).

¶28 As for A.P.D.'s allegation that the circuit court failed to comply with the *D.J.W.* directive here by not making the required specific findings, this court disagrees. Could this circuit court have made more findings? Yes—it could have. But the purpose of the *D.J.W.* directive was satisfied. A.P.D. had notice as to which dangerousness standard the County based its prosecution on, and the circuit court specifically indicated that it grounded its decision in WIS. STAT. § 51.20(1)(am) and linked it to § 51.20(1)(a)2.e. All parties knew the statutory standards that were being applied, and the circuit court's decision provides this court with notice as to which dangerousness standard it relied on and its reasons for doing so. *See S.A.M.*, 402 Wis. 2d 379, ¶36 (recognizing that even "[t]hough no witness recited the Third [dangerousness] Standard with exactness," the record showed "the circuit court, parties, and witnesses [were] all in accord regarding the statutory standards they were applying").

16

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.